# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Martin Yate,

           Plaintiffs,

  v.

Adams Media, Inc. and Simon & Schuster, Inc.

           Defendants.

Civil Action No. _____

## COMPLAINT

Plaintiff Martin Yate ("Yate") brings this Complaint for Copyright Infringement, breach of contract, fraud, unjust enrichment, and violations of Chapter 93A against Defendants Simon & Schuster Inc., ("Simon") and Adams Media, Inc. ('Adams') (collectively, "Defendants"), and allege:

## NATURE OF THE ACTION

1.     This is an action for Copyright Infringement of one or more of copyright registration Nos. TX0008482833, TX0009302974, TX0007989368, and TX0009302980, ("Copyrighted Works") pursuant to 17 U.S.C. §§ 411, 501, and 502.  Furthermore, Yate brings this action for fraud, breach of contract, and unjust enrichment under Massachusetts law.  Yate also brings this action under M.G.L. Ch. 93A for the pattern of fraudulent conduct that continues at least through the present in August 2023.

## PARTIES

2.     Yate is an individual who resides at 394 Highwater Drive, Hardeeville S.C. 29927.

3.     Simon is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1230 Avenue of the Americas, New York, NY 10020.

4.     Upon information and belief, Simon further has offices located in this district through its wholly owned entities at 100 Technology Center Drive, Suite 501, Stoughton, MA 02072 and Damonmill Square, 9 Pond Lane, Suite 6B, Concord, MA 01742.

5.     Adams Media is a corporation organized and existing under the laws of Delaware, with its principal place of business at 100 Technology Center Drive, Suite 501, Stoughton, MA 02072.

## JURISDICTION AND VENUE

6.     This action arises under the copyright laws of the United States, 17 U.S.C. §§ 100, *et seq,* and this Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(a).

7.     Based on the facts and causes alleged herein, and for additional reasons to be further developed through discovery, this Court has personal jurisdiction over Defendants.

8.     This Court has personal jurisdiction over Defendants because, upon information and belief, Defendant regularly does business in Massachusetts and has engaged in a persistent course of conduct within Massachusetts by continuously and systematically placing goods into the stream of commerce for distribution throughout the United States, including Massachusetts; in reference to Yate since September 1985.  On information and belief, Defendants have two regular and established places of business in Massachusetts and are registered as a foreign corporation with Massachusetts's Secretary of State under Registration No. 131174569.  Defendants have filed annual reports to maintain its status as a foreign corporation since 1977 to present.

9.     Furthermore, Simon purchased Adams in 2016 and took over operations of Adams. Upon information and belief, Adams remains an imprint under Simon and produces goods that are

- 2 -

put into the stream of commerce in the United States both in Massachusetts and from Massachusetts.

10.    Simon also owns Pimsleur Language Programs, which is another imprint owned by Simon, and that operates in Massachusetts and produces goods that are put into the stream of commerce in the United States both in Massachusetts and from Massachusetts.

11.    Upon information and belief, to the extent that Adams and Pimsleur Language Programs are separate entities, both Adams and Pimsleur Language Programs are listed as acting under the direction, and for the benefit, of Defendant, and are controlled and/or dominated by Defendant.  Upon information and belief, Defendant operates as a single integrated business.

12.    This Court has personal jurisdiction over Defendants because, for example, Defendants entered into agreements with Yate through Adams.  Upon information and belief, Simon acquired Adams and all agreements, which Adams was under obligation to Yate.  Those agreements (Exhibits A-M) require the application of Massachusetts law.

13.    Upon information and belief, Defendants continue, and will continue, to manufacture, market, and/or sell within the United States goods that are, and will be, provided to customers throughout the United States and in Massachusetts.

14.    In addition, Simon has previously submitted to the jurisdiction of this Court and has previously availed itself of this Court by asserting counterclaims in other civil actions initiated in this jurisdiction.  For example, Defendant answered a complaint against it in *Argov v. Simon & Schuster, Inc. et al.*, 1:20-cv-11284-GAO (D.MA) and availed itself of the jurisdiction of this Court to quash subpoenas in *Kendall/Hunt Pub. Co. v. Harold W. Hawkins*, 1:97-mc-10227, D.I. 1 (D.MA.).

15.    In the alternative, this Court may exercise personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2) because Yate's claims arise under Federal law,

and Defendants have sufficient contacts with the district, including but not limited to marketing and/or selling goods that are distributed and sold in Massachusetts, such that this Court's exercise of jurisdiction would satisfy due process.

## BACKGROUND

16.    Yate is an author, and NY Times bestseller, with some 15 copyrighted titles published by Adams, Adams/Simon since September of 1985. Unbeknownst to Yate, Simon took three of these titles and turned them into a collection. They repeated this in three separate collections, one print and two Ebook collections with each collection featuring three of Yate's titles; none were reported to Yate and no royalties ever paid. These  books address various aspects of career management  and business management, including books related to finding jobs and succeeding in them.  All the Copyrighted Works were filed with the Copyright Office prior to the assertion of this action and prior to the infringing acts of Defendants.

17.    Upon information and belief, Defendants utilize an accounting system that tracks two sets of data. One is provided to Yate and a second is maintained internally.

18.    Upon information and belief, the accounting system permits Defendants to incrementally siphon royalties from Yate such that Defendants scheme went undetected for years.

19.    Defendant knew, or should have known, that the Copyrighted Works were registered with the Copyright Office.

20.    Beginning in April 1985 through contracts signed in 2017, Defendant Adams , and then Simon and  Adams requested that Yate produce material for publication.

21.    The contracts at issue had terms of 1 or 2 years.  The contracts were executed on March 11, 2013 (*First Job Seekers*), March 27, 2013 (*Knock 'Em Dead Ultimate Job Search 28th Ed.*), April 27, 2013 (*Hiring The Best*), January 23, 2014 (*Knock 'Em Dead Resumes 11th Ed., Knock 'Em Dead Cover Letters 11th Ed., Knock 'Em Dead Ultimate Job Search 29th Ed.*), February

11, 2015 (*Knock 'Em Dead Ultimate Job Search 28th Ed.*), July 20, 2016 (*Knock 'Em Dead Ultimate Job Search 29th Ed., Knock 'Em Dead Cover Letters 12th Ed., Knock 'Em Dead Resumes 12th Ed.*).  Five of these agreements terminated  in Fall 2014, the balance by July 20, 2018.

22.     The sheer number of agreements establish that Defendants viewed Yate as a valuable author.

23.     Amongst the complex body of work executed by Yate, contracts requested  a series of works that involved helping people improve their resumes, cover letters, job search and interview tactics. Two of these books have gone through twelve editions  since publication in 1988 and 1990 (both still in print today); another work published in 1985 is also still on sale and now in its 29th  edition.  Each of these works has been copyrighted since publication. All three of these books were part of a settlement in the 1994/5; and another settlement in 2012.

24.     Nevertheless, in 2011, Yate discovered that Adams Media was publishing seven titles in ebook version without the permission of Yate.  In addition, Adams Media was paying Yate only 10% royalties on sales of these Ebooks – the publishing norm for Ebooks is 50%.

25.     When confronted about their activities, Adams Media agreed to take the books out of circulation and enter into one-year licenses that required annual renewal.

26.     Adams Media further agreed to arbitrate further issues at the expense of Adams Media up to $10,000.

27.     Upon information and belief, this shows a pattern of conduct of defrauding Yate over the course of decades.

28.     This fraud occurred even as Defendants reaped the benefits of Yate's works. Adams Media sold the numerous Copyrighted Works by Yate and earned substantial sums from 1985 through 2016.

29.     In 2016, Adams Media was acquired by Simon and sales of these titles continued.

30.     In first quarter 2019, Defendants told Yate that they would no longer be selling the Copyrighted Works for publication of Ebooks and were permitting licenses to terminate. There were three licenses that terminated that quarter [KED 2017, Resumes 12th, and Cover Letters 12th]. There were also five licenses that expired in the 3rd and 4th quarters in 2014.

31.     However, Defendants did not stop selling any of these Copyrighted Works but continued to sell them, unbeknownst to Yate, until 2023.

32.     Upon information and belief, Defendants concealed the sales of the Copyrighted Works and further failed to provide an honest record of sales for the Copyrighted Works during the entire period of the sale of the Copyrighted Works.

33.     In June 2022, after Yate's previous efforts, since 2018, had failed to reconcile perceived reporting inconsistencies amicably , Yate requested an audit of the sales of his works as was his right under the agreements.  It was not until that audit that Yate discovered the true extent of ongoing copyright infringement and fraudulent concealment of Defendants' sales of the Copyrighted Works.

34.     Upon information and belief, Defendants conspired to defraud Yate from funds in which he was entitled to obtain through accounting practices that were knowingly and intentionally designed to improperly withhold funds from Yate.  Furthermore, Defendants conspired to infringe the copyrights of Yate's Copyrighted Works to siphon funds from Yate to Defendants.

35.     This behavior has been replicated by Defendants against Yate and other authors.

36.     Yate accused Adams Media of improper accounting and fraudulently withholding royalties from Yate in 1995.  Yate and Adams Media negotiated a settlement in which Yate was paid significant funds.

37.    Yate further accused Adams Media of improper accounting and fraudulently withholding royalties from Yate in 2012. Yate and Adams Media again negotiated a settlement in which Yate was paid significant funds.

38.    Defendants repeated their fraudulent behavior against another author in this District.  Sherry Argov alleged that "Defendants knew, and recklessly disregarded the essential terms of the Publishing Agreements. Their acts significantly reduced Argov's earning capacity, intentionally frustrated her rights under the Publishing Agreements, artificially lowered the number of books sold on her statements and damaged the commercial value of her copyright" (*see* Exhibit N).

39.    Argov further alleged that "Defendants exploited rights not granted, then made arbitrary decisions about how (and from what pool of money) it would pay Argov if anything. Defendants significantly eroded the royalties paid to the Plaintiff, which constitutes a material breach of the Publishing Agreement" (*see id.*)

40.    Argov also alleged that Defendants distributed free copies of Ebooks but refused to provide any information regarding the scope of the activities (*see id.*).

41.    Likewise, Yate has discovered that Simon has distributed the ebook format of  29th edition of *Knock 'Em Dead - Job Search Guide*, free on Amazon  since the date of publication in September 2017 to the present date in August 2023, despite repeated written requests.  Amazon accounts for between 60-70% of all books sold.

42.    Such conduct is strikingly similar to the conduct alleged in this complaint.  It is thus clear that Defendants are not merely aware that their conduct infringes on Yate's copyrights but that such conduct is knowing and intentional and designed to fraudulently enrich Defendants with revenues that rightfully belong to Yate.

**Copyright Infringement**

43.     Yate is the lawful owner of the Copyrighted Works.  Pursuant to agreements with Defendants, Yate filed the Copyrighted Works at his own expense and has maintained the Copyrighted Works (*see* Exhibit A).

44.     All the agreements between Yate and Defendants are terminated, except for all print titles, and an Ebook version of Knock 'Em Dead 29th  edition.

45.     However, in February 2019, after the expiration of all Ebook agreements, Defendants assured Yate that they had withdrawn from sale all Ebooks not under license from sale and would no longer sell any of his Copyrighted Ebook Works.

This statement was untrue, and, upon information and belief, this claim was a misrepresentation meant to allow Defendants to continue to obtain revenues from Yate's Copyrighted Works, while retaining all the revenues improperly - five Ebook titles have been for sale up to and including 2023. Such actions represent both fraud and copyright infringement (Quote from Counsel Greene: "yours is a very complex body of work."].

46.     Yate entered into over 70 agreements and amendments with Adams

to write the Copyrighted Works.  For example, since beginning in September 1985 Yate has

written many editions for a series of job-hunting books, under the rubric "Knock 'Em Dead."

For instance, Yate's first book (about landing jobs and pursuing a successful career)  has been a

NY Times Bestseller and has also been published in 29 editions over thirty-eight years in U.S.

and in over 20 foreign languages.  It is still in print, and the copyright is still being abused.

Yate's books have earned revenue for Defendants fifty-two weeks a year from 1985 to the

present day – that is, thirty-eight years. Few books ever achieve this status.

47.    The agreements gave Defendants the right to "publish the Work at its own expense within one year from the date of receipt of the completed manuscript copy" (*see, e.g.,* Exhibit A). The "Work" is defined as to include "any revisions, rewrites, and new editions thereof" (*id.*). Defendants thus had the ability to print the Work under the scope of the agreement.

48.    The agreements for Ebooks, a dominant but not the sole focus of this complaint, required Defendants to pay royalties of 50% and to provide semi-annual statements on July 1 and January 1 of each year.  The statements "shall show the number of copies printed, sold, spoiled, given away, and on hand. The Author shall have the right upon his/her/their written request to have their Certified Public Accountant examine the Publisher's books insofar as they relate to the Work, at the Author's expense."  In addition, the agreements made clear that "under no circumstances may the Publisher withhold payment of royalties in anticipation of copies to be returned" and "under no circumstances will the Author be required to notify the Publisher of when royalty payments are due."

49.    After the termination of every agreement, Defendants continued to sell and distribute the Copyrighted Ebook Works without Yate's knowledge, after claiming in February 2019 that all such sales had ceased.  Indeed, Defendants denied that they were selling Yate's Copyright works, while selling the Copyrighted Works and concealing those sales for years from Yate.  Because these sales occurred outside of any license agreement, they represent copyright infringement.  Defendants continued selling but stopped reporting any sales of Ebooks after their February 2019 claim to have stopped selling these titles; improper sales continue into 2023.

50.    After agreements terminated, Defendants continued to sell *Knock 'Em Dead 2016: The Ultimate Job Search Guide*, *Knock 'Em Dead 2017: The Ultimate Job Search Guide*, *Knock 'Em Dead Resumes 12th Edition*, *Knock 'Em Dead Resumes 11th Edition*, *Knock 'Em Dead Cover Letters 12th Edition*, *Knock 'Em Dead Cover Letters 11th Edition*, *Uncertain World*, and *Knock*

*'Em Dead* Ebooks.  These sales were outside of license and represented 8,842 infringing sales of trade/paperback books and Ebooks across Copyrighted Works.

51.     Further, the Defendants went on to combine the entire content of three of these copyrighted, but out of license books, into a new product, a "Knock 'Em Dead Ebook collection," (ISBN 150720678X).  and sold this collection without the knowledge or permission of Yate, without signed contract and without reporting sales or  paying royalties from 2nd quarter 2019 – to 4th quarter of 2021. Yate has four royalty quarters a year, so this collection's sales were hidden from Yate for its entire publishing life, equating to two and half years, or 10 royalty periods.

52.     The Defendants then repeated, this time with a print collection, which again collected  the content from the same three individual titles and sold them with a new ISBN (1507206771),  selling them without the knowledge or permission of Yate, without signed contract and without  reporting sales or  paying royalties from 4th quarter 2017 – to 1st quarter of 2021. This collection's sales were also hidden  from Yate for the collection's entire publishing life, covering  three-plus years  - or 14 royalty periods.

53.     The Defendants then repeated this fraudulent behavior a third time with another collection of Ebooks, again selling them without the knowledge or permission of Yate, without signed contract and without  reporting sales or  paying royalties; additionally,  this third set was sold without being assigned its own unique and valid ISBN number. This collection was on sale from 1st quarter 2018 – to 4th quarter of 2021, and its sales were  also hidden  from Yate for its entire publishing life, four years  - or 16 royalty periods.

54.     Upon information and belief, these compilations were created to obtain additional revenues for Defendants and to conceal  and deprive Yate of  his rightful income.

55.     Defendants further knowingly operated outside of the scope of the license agreements by creating compilations and versions of the Copyrighted Works.  These works were sold outside of the scope of any license and Yate did not provide permission for such sales.

56.     During the period of  Defendants selling these titles, Defendants did not report that the sales were occurring.  Indeed, Defendants told Yate in a written communication to Yate in early 2019  that no Ebook sales  were occurring  or would occur in the future.

57.     Upon information and belief, Defendants were aware that the sales were occurring and that the three titles included in both of the  improper Ebook collections were not covered by license.

58.     Such infringement is willful.  Defendants knew that the works were copyrighted and nevertheless proceeded, not only to sell and distribute works that were no longer under affected contract, but to create multiple new products from books that were already out of license and to sell these new titles.

59.     Each of the infringements used the Knock 'Em Dead trademark, registered, and held by Yate since 2011, on out of license products and therefore illegal publications without permission.

60.     Defendants are global publishers and understand the requirements under the Copyright Act.  Defendants understood Yate had copyrighted his work because the agreements required Yate to do so, if they, the defendants did not, as the book contracts stipulated, they should.  Defendants also understood that  they had been selling five titles out of license since 2014  when licenses for five of these titles expired; and this despite being told repeatedly since 2017 that the titles were out of license.

61.     Defendants further knowingly operated outside of the scope of the license agreements by creating three compilations and versions of the Copyrighted Ebook Works; each time using the same three out-of-license titles to build these improper collections.

62.     Defendants knowingly failed to inform Yate that these three new compilations existed and failed to report revenue earnings to Yate.  Upon information and belief, these compilations were created to obtain additional revenues for Defendants and to conceal revenues from Yate.

**Fraudulent Concealment of Earnings and Breach of Contract**

63.     From the beginning of their relationship in 1985, Adams improperly withheld earnings that should have been distributed to Yate.  This conduct led Yate to assert claims of copyright infringement and breach of contract, in 1993/1994, and 2011/2012, both of which were settled out of court to the benefit of Yate. This case is based on very similar behaviors.

64.     Upon information and belief, this conduct increased in severity after Adams was acquired by Simon.

65.     Pursuant to the agreements, Defendants were required to pay Yate 50% of revenues from  sales of Ebooks and to provide quarterly reports on said  sales.  The audit shows this has never been done accurately since Adams acquisition  by Simon in 2016.

66.     Also, Defendants repeatedly have failed to report earnings in a timely manner.  50–55-page quarterly royalty statements are typically delivered 4-9 weeks after the corresponding cheque was received , or sometimes not at all; a strategy that made and makes it impossible for Yate to balance the cheques with the royalty statements.  Indeed, in 2023 despite notification, Defendants failed to even provide a statement for the first quarter of 2023; despite written requests this has never been delivered.

67.     Upon information and belief, such late and untimely quarterly reports were part of a scheme to make establishment of correct monies due impossible to achieve.

68.     Upon information and belief, Yate has received 25 royalty cheques from Simon, reflecting monies due from 25 royalty statements. However, 22 of these royalty payments had amounts that differed from the amount indicated on the royalty statement. In each of these 22 royalty periods, the amount paid was less than the amount due, as indicated in the royalty statements. This ongoing fraud continues up to and including the royalty statement and payment received in August 2023. In summary, 88% of royalty cheques written to Yate defrauded him of monies rightfully due.

69.     Upon information and belief, this scheme included Defendants failing to provide accurate statements.

70.     During the audits, Defendants, perhaps unwittingly,  disclosed to Yate two different sets of sales numbers:

The first included the values that were reported to Yate in the quarterly reports.

71.     However, a second  Simon database (made available in 2022 because of this audit) contained what, in many instances,  appears to be the actual royalties that Yate was due. However, Yate's accountants found significant anomalies even in this second proprietary database of sales numbers and it is apparent that, yet another sales database exists.

72.     Upon information and belief, the second database shows that Defendants conspired to misrepresent the true number of sales and returns in its royalty reports to Mr. Yate. The second database established that the Defendants fraudulently decreased the number of sales reported for a title, while simultaneously, and fraudulently inflating the number of returns that are reported. Over many years nine different Yate titles have been impacted by the repeated deflation  of real sales and inflation of phony returns.

73.     This fraud was carried out in different ways. For example, in one instance, Defendants reported to Yate that over a period of time, *Knock 'Em Dead 29th Edition* earned gross sales of 20,422 with returns of 4,793 for sales of 15,629.  Although the contract clearly specifies that royalty payments are to be based on retail sales, Simon reported the sales based on net – a much smaller amount.

74.     Nevertheless, the second database showed that the gross sales were 23,176 with returns of 4,690 for sales of 18,896: In reality sales were significantly higher than reported or paid while returns were significantly yes.   In short, the second database showed an increase of 3,267 additional sales that Yate was not paid. Yate only discovered this difference through the recently completed audit.

75.     Based on information and belief, reporting and royalties for print sales of *Knock 'Em Dead 29th Edition* ended in June of 2022 . Reporting and royalties for Ebook sales of *Knock 'Em Dead 29th Edition* ended in March of 2022. Meanwhile, Yate claims that sales of both formats have continued to the present day in August of 2023.

76.     Yate believes that Defendants have utilized at least two different databases – one to report "earnings" in the quarterly royalty reports that bears no relationship to reality, and another one that more accurately track actual sales.   This conduct represents fraudulent concealment of sales from Yate.

77.     The mechanics of this fraudulent scheme made it impossible for Yate to determine that Defendants had been breaching their publishing agreements with Yate at least since 2016 when Simon acquired Adams.

78.     It should be noted that it was only at this time that the audit established that Defendants had been selling books out of license and creating new compilations of works of which Yate was unaware.

79.     In total, Defendants appear to have been violating Yate's copyrights, while also withholding royalties and intentionally misreporting  sales ever since acquisition of Adams in 2016.

80.     All sales  reported in the royalty reports from 2nd quarter of 2019 through 4th quarter of 2021 for these three Ebooks were all the same  (11 quarters or 2 and 3/4 years):

*Knock Em Dead Resumes 12th edition*

*Knock Em Dead Letters 12th edition*

*Knock Em Dead 2017 28th edition*

81.     Yate questioned counsel Greene about this, and she replied that these were sales of an Ebook set that included the above titles formatted into one new title. She added that Yate must know this because he had signed a contract.

82.     Yate did not know of and has never signed a contract for this collection. Furthermore, these three books transformed into one new title in a different format would also require an ISBN; there is no ISBN for this collection.

83.     In response to these questions, Adams Media contract manager, Chris Duffy, stated in an email, dated February 2019, "At this time we have we have removed all Ebooks from the marketplace except for Knock 'Em Dead: The Ultimate Job Search Guide. This is the only book under Martin's authorship for which electronic rights remain with the publisher."

84.      This, however, was untrue.  On August 7, 2023, Yate purchased an individual copy of *Knock 'Em Dead Social Networking.*

85.     Indeed, Defendants have not reported sales of this title reported since the second quarter of 2022.

86.     Regarding *Knock Em Dead Secrets & Strategies – 1st time job Seekers*, Yate last bought an individual copy on August 7, 2023 .

87.     No sales of this title have been reported since acquisition in 2017.

88.     Regarding *Knock Em Dead Cover Letters 11th Edition*, Yate last bought an individual copy on August 7, 2023.

89.     No sales of this title have been reported since the second quarter of 2022.

90.     One method of hiding  sales was Defendants failure to report sales of one or more Copyrighted Works in most quarterly reports.

91.     While selling the Copyrighted Works, Defendants logged over 8,842.00 book sales that were never reported to Yate.  The unreported sales broke down to 6,731 print/trade/paperback Copyrighted Works and 2,111 Ebook Copyrighted Works  that were never reported nor paid to Yate.

92.     Defendants further utilized "unearned balances."  Unearned balances are generated when an author obtains advances to write a work.  Defendants improperly utilized unearned balances to improperly retain earnings from Yate.

93.     First, Defendants improperly asserted that Yate owed money made from advances on several titles in which ***advances were paid in full years earlier***.

94.     In particular, the unearned balances are vastly higher than any advance that was ever paid by Adams Media to Yate.

95.     Upon information and belief, Defendants have also utilized unearned balances to improperly withhold revenues from Yate.

96.     Upon information and belief, Defendants knowingly were withholding said revenues and concealed their activities through unearned balances.

97.     Second, Defendants reported unearned balances that at best fluctuated, but none went down by more than two thousand five hundred dollars, despite quarterly payments over six

years; additionally, were these payments went has been withheld by Defendants and are not mentioned in either sales data base currently available to Yate.

98.    In one instance, the unearned balance  of $103,000 from 2017  dropped to around $101,000 today, despite payments every quarter and no advances needing to be repaid.

99.    Upon information and belief, every *Knock 'Em Dead* title had any "unearned balances" paid off years earlier and yet every title has substantial unearned balances remaining.

100.    Furthermore, every edition that existed prior to Simon acquiring Adams Media, and three editions published since all continue to have improperly calculated unearned balances.

101.    For example, in 2017 a new title appeared in unearned balances, a fourth "collection," The *Knock 'Em Dead Job Search Kit*. A contract for this title was signed in 2011 but all sales were hidden by Adams Media and were never reported by Adams Media.  In  the second quarter of 2017 this title appeared and revealed an unearned balance of $52,080.76. Simon has never reported sales for this book. Nevertheless, in the second quarter of 2023, the unearned balance increased to $52,124.47 .

102.    Yate investigated this issue, and, on August 4, 2023, he was able to buy a *Knock 'Em Dead Job Search Kit* on Amazon for the reduced price of $23.

103.    Defendants have failed to inform Yate of why the unearned balances were being withheld from Yate. Other titles with unearned balances reveal similar treatment. Over six and a half years the Defendants, upon information and belief, manipulated unearned balances to improperly retain  a running balance of over $100,000 of royalties that were rightfully Yate's.

104.    Upon information and belief, Defendants knowingly and willfully reported false unearned balances in violation of the license agreements.

105.    Furthermore, Defendants failed to provide any evidence of how unearned balances were calculated or why the unearned balances never decreased. Neither Yate nor the accountants

have been able to trace where these payments against unearned balances went – they did not go to Yate.

106.    As a result of the recent audit, it has now been discovered that Adams continued to improperly withhold earnings from Yate and such actions continued after Simon purchased Adams Media.  Upon information and belief, Simon acquired the contracts from Adams and continued the fraudulent conduct executed by Adams for decades.

107.    Upon information and belief, Simon was aware of the conduct of Adams Media and, as Adams Media was brought into the Simon family of imprints, Simon knowingly allowed Adams Media or alternatively actively conspired with Adams Media to infringe Yate's copyrights and to withhold royalties from Yate. …

## COUNT I (COPYRIGHT INFRINGEMENT)

108.    Each of the preceding paragraphs 1 through 107 is incorporated as if fully set forth.

109.    Defendants do not have any authorization, permission, license, or consent to exploit the Copyrighted Works.

110.    Defendants have unlawfully reproduced, sold, and distributed thousands of Copyrighted Works for which Yate is the legal or beneficial copyright owner.  The Copyrighted Works are protected by valid registrations duly issued by the U.S. Copyright Office. The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501 *et seq*.

111.    Each infringement of the Copyrighted Works constitutes a separate and distinct act of infringement.

112.    The foregoing acts of infringement by Defendants have been willful, intentional, purposeful, in total disregard of Yate's rights. Indeed, the Copyrighted Works represent copyrights infringed by Defendants.

113.    Defendants' actions described above, which are ongoing, have caused and will continue to cause irreparable damage to Yate, for which Yate has no remedy at law. Unless Defendants are restrained by this Court from continuing its infringement of Yate's copyrights, these injuries will continue to occur in the future. Yate is accordingly entitled to injunctive relief restraining Defendants from further infringement.

114.    Yate is also entitled to statutory damages and willful damages pursuant to 17 U.S.C. § 504(c)(1)(2).

## COUNT II (FRAUD)

115.    Each of the preceding paragraphs 1 through 114 is incorporated as if fully set forth.

116.    Upon information and belief, Defendants have conspired to withhold reporting of sales from Yate and to sell unlicensed Copyrighted Works without the knowledge of Yate, while failing to report or pay royalties, preferring to illegally keep these revenues.

117.    Since the beginning of their contractual relationship, upon information and belief, Simon and Adams have intentionally and willfully misreported earnings on sales by decreasing the numbers of books sold and increasing the numbers of books returned to drive down  sales.

118.    Upon information and belief, Simon maintained the same systems that Adams Media maintained as to paying Yate what was due pursuant to contract.

119.    Upon information and belief, Defendants further utilized an opaque system of "unearned balances" to improperly withhold from Yate revenues that he was entitled to.  Upon information and belief, Defendants continued to charge Yate for unearned balances that were paid off years ago and, in other cases, never applied revenues to balances.  As a result, income that was rightfully Yate's was siphoned into the pockets of Defendants, while over $100,000 was, and is being, improperly retained by Simon.

120.    Upon information and belief, Defendants further compiled 2 different databases as part of a scheme to shortchange Yate of what was rightfully his.  One database contained sales numbers that would be reported to Yate.  However, that database provided false and inaccurate sales numbers.

121.    A second database was provided to Yate during the audit that provided more accurate sales.  Upon information and belief, Defendants did not intend to provide that database to Yate.

122.    Nevertheless, upon information and belief, the second database showed more accurate sales and said sales were far higher than the sales reported to Yate in the quarterly royalty reports.

123.    Defendants further concealed their copyright infringement from Yate.

124.    In early 2019, Defendants assured Yate that they were no longer selling the Ebook Copyrighted Works.  Notwithstanding this promise, Defendants continued to sell several Copyrighted Works until the present day.

125.    Yate discovered this conduct through the audit and investigations of Defendants' conduct.

126.    Upon information and belief, Defendants intentionally and willfully engaged in a fraudulent scheme to hide the sale of Copyrighted Works, including the improper production  and sale of three sets of compilation works.

127.    The totality of Defendants scheme was to conceal, hide, and withhold information from Yate to ensure that Yate never received money that was rightfully his and to never uncover the infringement of his copyrights.

128.    For these reasons, Yate is entitled to an injunction to prevent the irreparable harm that he will suffer and to payment of damages.

## COUNT III (VIOLATION OF CHAPTER 93A)

129.   Each of the preceding paragraphs 1 through 128 is incorporated as if fully set forth.

130.   As set forth above, Defendants conspired to conceal  sales and copyright infringement from Yate.

131.   Specifically, Defendants withheld information that was vital for Yate to identify what he was rightfully owed and misled Yate as to infringements of his copyrights.

132.   Had Defendants not concealed these facts, Yate would have received what was rightfully due to him and would not have suffered the thousands of infringements of the Copyrighted Works.

133.   Defendants' conduct was, and remains, deceptive and is a business practice that is so engrained in the Defendants culture that even after the acquisition of Adams Media in 2016, Simon continued the deceptive practices of Adams Media.

134.   In addition, Simon has been accused by other individual authors, and in class action lawsuits in 2012, 2016 of schemes to withhold revenues and improperly sell works outside of the scope of agreements.

135.   While marketing, promoting, selling, and distributing the Copyrighted Works, Defendants made material misrepresentations to Yate about the amount of gross sales, the titles being sold out of license, the amount of returns, the amount of sales, unearned balances, and whether they were selling the Copyrighted Works.  Pursuant to M.G.L. c. 93A, such false statements and misrepresentations constitute unfair or deceptive trade practices that are prohibited by M.G.L. c. 93A.

136.   In total, Defendants made material misstatements and material omissions to Yate concerning almost the entirety of the license program.

137.    These acts and practices occurred in trade or commerce as defined in M.G.L. c. 93A, §1(b).

138.    These acts or practices  affected the public interest because they impacted commercial relationships governed by contractual relations within the Commonwealth of Massachusetts and involved a business licensed to operate within the Commonwealth.

## COUNT IV (BREACH OF CONTRACT)

139.    Each of the preceding paragraphs 1 through 138 is incorporated as if fully set forth.

140.    Defendants had contractual relations with Yate.

141.    Defendants are required to pay Yate a 50% royalty on  sales for all Ebook sales and to provide quarterly reports accurately detailing such sales.

142.    Defendants breached their agreements with Yate.

143.    Specifically, upon information and belief, Defendants withheld the actual sales from Yate and failed to pay the appropriate royalties to Yate.  Furthermore, Defendants did not, and do not, provide timely or accurate quarterly reports to Yate from 2016 to the present day in August 2023.

144.    In addition, Defendants improperly charged Yate for unearned balances that were not owed to Defendants.

145.    All these actions represent breach of contract.

146.    Yate further did not identify the breaches of his agreements because, upon information and belief, Defendants withheld information that was vital for Yate to identify what he was rightfully owed and prevented Yate from identifying the breaches of his contracts.

147.    Yate is entitled to compensation for the damages that he suffered relating to the breaches of his contracts.

## COUNT V (UNJUST ENRICHMENT)

148.   Each of the preceding paragraphs 1 through 147 is incorporated as if fully set forth.

149.   Yate conferred a substantial benefit on Defendants by providing a license for his Copyrighted Works.

150.   Defendants accepted this benefit by entering into the licensing agreements with Yate and promising to pay Yate so that they could sell his Copyrighted Works.

151.   Defendants, upon information and belief, retained substantial sums of money during the contractual relationship with Yate to which Defendants were not entitled.  Defendants have no rights in improperly retained funds through their improper withholding of accurate  sales, improper withholding of funds associated with improper calculating of unearned balances, and improper reporting of   sales. For example, shortages identified by the audit accountants are $8,711.36 for regular sales and  $58,217.02 subsidiary sales shortages, for a total $66,928.38 owed to Yate that have unjustly been withheld from proper royalty payments.

152.   For these reasons, Defendants withholding of money associated with their conduct would be inequitable.

153.   Accordingly, Defendants should pay for the value of the funds withheld.


## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief:

1.   A judgment that Defendants have infringed upon the Copyrighted Works and that such infringement was willful.

2.   A judgment that Defendants had breached their contracts with Defendant and that such breach was willful.

3.      A judgment that Defendants had committed fraud when breaching their contracts and had fraudulently conspired to infringe upon the Copyrighted Works.

4.      A judgment that Defendants had unjustly enriched themselves through their conduct.

5.      A judgment that Defendants had violated M.G.L. c. 93A through their fraudulent and deceptive business practices and conduct to defraud Yate of revenues associated with the sales of the Copyrighted Works and through their attempts to conceal their Copyright Infringement.

6.      An order permanently enjoining Defendants from further fraudulent conduct.

7.      An order awarding damages to Yate.

8.      An order trebling damages pursuant to M.G.L. c. 93A.

9.      That Yate be awarded his fees and costs enforcing his rights in this litigation; and

10.     Such further relief as this Court deems proper and just, including but not limited to any appropriate relief under Title 17.

## **JURY DEMAND**

Plaintiff demands that all issues so triable be tried before a jury.

Date: November 8, 2023

David A. Chavous, BBO 660332
Chavous Intellectual Property Law LLC
P.O. 229
Boxford, MA 01885
(351)207-5972
dchavous@chavousiplaw.com
*Attorneys for Plaintiff*
*Martin Yate*

- 24 -